# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**GARY STEVEN BAKER, JR.**

     **Plaintiff,**

**v.**                                        **Case No. 8:12-cv-1636-T-35SPF**

**M. PARSONS, *et al.*,**

     **Defendants.**

_____/

# O R D E R

This cause comes before the Court on Defendants M. Parsons and A. Taylor's motion for summary judgment (Doc. 63), Plaintiff Gary Steven Baker, Jr.'s response (Doc. 66), and Defendants' reply (Doc. 73).  Also before the Court is Plaintiff's cross-motion for summary judgment (Doc. 64) and appendix thereto (Doc. 65), Defendants' response (Doc. 67), and Plaintiff's reply. (Doc. 69)  Having considered the motions and being otherwise fully advised, the Court **ORDERS** that Plaintiff's motion for summary judgment (Doc. 64) is **DENIED**, and Defendants' motion for summary judgment (Doc. 63) is **GRANTED**.

## I.  BACKGROUND

Plaintiff Baker brings this action under Title 42 United States Code Section 1983, alleging that, while confined in the Hardee Correctional Institution, Defendants violated Baker's (1) right to exercise his religion, and (2) right to equal protection.  He also asserts that Defendants violated his rights under the Religious Land Use of

Institutional Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc–1, and under Florida's Religious Freedom Restoration Act of 1998 ("FRFRA"), Fla. Stat. § 761.03.

Generally, Plaintiff claims that Defendants have improperly denied his requests to possess or use items of alleged significance to his Mystic faith. He also claims that Defendant Parsons refused to assist Plaintiff in observing a sacred religious fast. Finally, he contends that Defendants have, on the basis of his religion, denied him access to the chapel and denied his request to schedule a Mysticism study group. He seeks declaratory and injunctive relief,[1] along with nominal damages.

An earlier order dismissed Plaintiff's claims against Defendants Lawrence, Mount, and Bowden. (Doc. 41 at 6–7) At this stage of the proceedings, the only remaining defendants in this case are M. Parsons (Chaplain) and Alex Taylor (Administrator of Chaplaincy Services, Florida Department of Corrections ("DOC")).

The Court notes that, upon review, the complaint does not clearly specify whether Plaintiff is suing Defendants in their official or individual capacities. "[W]hile it is 'clearly preferable' that a plaintiff state explicitly in what capacity defendants are being sued, 'failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice.'" *Young v. Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1047 (11th Cir. 2008) (quoting *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir.2001)).

---

[1] As part of the relief sought, Plaintiff seeks an order from the Court requiring Defendants to assist Plaintiff with his pursuit of Mysticism, to allow Plaintiff to submit a chaplain's guide for the Mysticism religion, and to permit Plaintiff to obtain and use a number of items that he claims pertain to the practice of his religion. He also seeks an order requiring Defendants to build a twenty-foot by twenty-foot building for use as a meditation room. (Doc. 1 at 7,10–11)

Defendants inferred from the Complaint that Plaintiff sued them in both capacities. (Doc. 63 at 4, 19, 21–23) However, in his response to Defendants' motion for summary judgment, Plaintiff clarifies that he asserts RLUIPA claims against Defendants in their official capacities (Doc. 66 at 3, 10, 11, 21) and he asserts free exercise, equal protection, and FRFRA claims against Defendants in their individual capacities. (Doc. 66 at 11–12, 21–22) Therefore, Plaintiff has affirmatively repudiated individual capacity RLUIPA claims and official capacity free exercise, equal protection, and FRFRA claims against Defendants. Accordingly, Defendants' motion for summary judgment on those claims — to the extent the complaint could have been construed to raise them — is **GRANTED**.

## II.  SUMMARY JUDGMENT

The granting of summary judgment is proper "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[2] and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. *See In re Optical Technologies, Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2001). A court must view the documents in the light most favorable to the non-moving party and the documents must show that the non-moving party is not entitled to relief under any set of facts alleged in the complaint. *See generally, Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590 (11th Cir. 1995).

---

[2]  A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

Where the non-moving party bears the burden of proof on an issue at trial, "the moving party [is not required to] support its motion with affidavits or other similar materials *negating* the [non-moving party's] claim." *Id.* at 323 (emphasis in original). Instead, the movant simply "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*

Once the movant presents evidence that, if not controverted, would entitle the movant to a judgment at trial, the burden shifts to the non-moving party to assert specific facts demonstrating the existence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001).

Even though an allegation in a *pro se* complaint is held to a less stringent standard than a formal pleading drafted by a lawyer, *Haines*, 404 U.S. 520, *Tannenbaum v. United States*, 148 F.3d 1262 (11th Cir. 1998), the plaintiff's allegations must have factual support. "The mere existence of a scintilla of evidence

in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir.) *reh'g and suggestion for reh'g en banc denied*, 182 F.3d 938 (11th Cir.), *cert. dismissed*, 528 U.S. 948 (1999). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.' " *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

### III.  UNDISPUTED FACTS

Upon review of the record, the following facts appear uncontested:

1. At all times relevant to this lawsuit, Plaintiff was, and remains, housed at Hardee Correctional Institution ("HCI"). (Doc. 1 at 1; Doc. 42 at 1)

2. At all times relevant to this lawsuit, Defendant M. Parsons was employed as the Chaplain at HCI. (Doc. 1 at 3; Doc. 42 at 1)

3. At all times relevant to this lawsuit, Defendant Alex Taylor was employed by the Department of Corrections as the Administrator of Chaplaincy Services.  (Doc. 1 at 4; Doc. 42 at 1)

4. Prison chaplains "must work with and accommodate numerous religions that are different from the chaplain[']s own beliefs," and space designated for religious activities must be shared by all inmates at HCI.  (Doc. 63 Ex. 1 at 6)

5. Prior to the events challenged in the instant lawsuit, Plaintiff identified his religion as Odinism. (Doc. 64 at 2)  While observing that religion, HCI officials confiscated

Plaintiff's lighter from his cell as part of a shake-down for contraband. (Doc. 64 at 6; Doc. 63 at 20)

6. On October 3, 2011, Plaintiff wrote to Defendant Parsons, Chaplain at HCI, requesting "access to, or the information pertaining to[,] what all the religion Mysticism is allowed to practice, receive, medallion to wear, e[tc]." He explained that he "would like to know all this before changing my faith, if I so do choose to in the future." (Doc. 63 Ex. 1 at 12; Doc. 65 Ex. 11 at 2)

   a. Defendant Parsons responded,[3] "Currently there is no information through DOC regarding this religion." (Doc. 63 Ex. 1 at 12; Doc. 65 Ex. 11 at 2)

7. Sometime thereafter, Plaintiff changed his religious affiliation to Mysticism and submitted the paperwork to change his listed affiliation with HCI.[4]

8. The DOC recognizes Mysticism as a religion but has established no guidelines as to the practice of Mysticism. (Doc. 63 Ex. 1 at 2; Doc. 67 at 5)

9. On October 18, 2011, Plaintiff submitted the following request to Defendant Parsons (Doc. 63 Ex. 1 at 13; Doc. 65 Ex. 3 at 2):

> Sir, I spoke to you when I changed my religion to Mysticism. You told me that you would deny everything I requested or tried to get in. I have already written Alex Taylor concerning this issue and what I need to be able to pray as . . . "God" tells me to pray, when to pray and how. Since they have taken lighters off the compound, and I need to light incense during prayer, I am requesting access to the chapel to pray and meditate 8 times a day, 4 times will be the same every day, the other four will

---

[3] The signature of the official responding to the request is not legible. However, Defendants do not appear to contest that Parsons, as the chaplain, responded to the requests addressed to him. (*See, e.g.*, Doc. 63 at 9, 11)

[4] Plaintiff contends he officially changed his religious preference with HCI before his October 18, 2011 request to Defendant Parsons regarding his prayer needs. (Doc. 64 at 2, ¶ 2; Doc. 63 Ex. 1 at 13; Doc. 65 Ex. 3 at 2) Defendants contend, however, that he did not do so until July 2014. (Doc. 63 Ex. 1 at 2)

change daily.  I will need access to a lighter, or one match per prayer.  If you have any questions, please call me up for exact times.

    a.  Defendant Parsons responded, "At this point it is not possible for you or anyone to come into the chapel to pray 4–8 times a day[.]  We will await a response from Mr. Taylor." (Doc. 63 Ex. 1 at 13; Doc. 65 Ex. 3 at 2)

10. Defendant Taylor recalls that Defendant Parsons contacted him during the fall of 2011 concerning Mysticism.  Defendant Parsons contacted him by telephone or email, and he responded by telephone. [5]  (Doc. 63 Ex. 1 at 5)

11. Defendant Taylor did not communicate with Plaintiff. (Doc. 64 at 2)

12. On October 25, 2011, Plaintiff submitted the following request to Defendant Parsons (Doc. 63 Ex. 1 at 16; Doc. 65 Ex. 11 at 4):

I am writing to advise you of all the materials I need for daily prayer and communion with God in my religion as God told me directly.  I need incense Frankin[c]ense/My[rrh] and sandalwood, charcoal bricks/disk, matches or a lighter, assorted color [tapered] candles, mystical oil #1 ancient wisdo[m] or High Johns and #2 anointing, small plastic bottle to keep daily applications, . . . 25 crystal/stone runes and 1 box to house these in, all except runes to be kept in locker.  I will also need a medallion that reflects my religious beliefs.  Now that you know that I need these items and what they are, your position as chaplain should be to promptly obtain them so as for prayer and communion with God.

    a.  Defendant Parsons denied the request without explanation. (Doc. 63 Ex. 1 at 16; Doc. 65 Ex. 11 at 4)

---

[5]  Plaintiff contends that Defendant Taylor's interrogatory responses belie the statement made in his affidavit that Parsons contacted him by phone or email and that he responded by phone.  (Doc. 63 Ex. 1 at 5, Doc. 65 Ex. 10 at 14–19)  However, Taylor's interrogatory response does not contradict his affidavit.  When asked whether he received emails from Parsons concerning Plaintiff and Mysticism, he responded that he "reviewed [his] emails and [did] not have any emails regarding [Plaintiff] and the Mysticism religion."  (Doc. 65 Ex.10 at 15)  That he does not have a copy of any potential email does not negate his averment that he recalled Parsons contacted him either by phone or email and that he responded by phone.

13. On October 26, 2011, Plaintiff filed an informal grievance that stated the following

(Doc. 63 Ex. 1 at 18–19; Doc. 65 Ex. 11 at 5–6):

> I am grieving the fact that Chapl[a]in Parsons is [refusing] to make accommodations to allow me to pray and commune with God and be able to receive the items needed; to which are mystic oil, incense Frankin[c]ense/myr[r]h & sandalwood, charcoal disk, assorted [tapered] candles, box to house these items, a small plastic bottle to hold daily amount of mystical oil, hard stick matches or a lighter, and a religious medallion that reflects my faith, Mysticism. Chapl[a]in Parsons stated from our first conversation that he would deny me anything I requested. It is evident that Chapl[a]in Parsons is not in compliance with Chpt. 33-503.001(c), 2(a), 2(b), 2(c), 2(c)(3)[,] thus he is maliciously denying myself prayer until someone in Tallahassee demands that he does conform to the Constitution; to religious freedom and chpt. 33-503.001c, 2a, 2b, 2c, 2c3. Which Chapl[a]in Parson[s'] job should mandate as chapl[a]in that he does conform to the Constitution 1st Amendment, "Freedom of Religion" and Chapter 33-503.001(c), 2(a), 2(b), 2(c), 2(c)(3).

> Relief sought: That Chapl[a]in Parsons makes availability of the chapel for me to pray 8 times a day and be able to order everything and take the daily needed amount to do my prayers within my cell, as I was doing before the lighters became contraband. And that Chapl[a]in Parsons be instructed on the religious rights of those who practice a recognized Religion and the description of his job title in Chapter 33-503.001 and how he shall help inmates to further their spirituality.

a. The informal grievance was denied with the following explanation (Doc. 63

Ex. 1 at 18; Doc. 65 Ex. 11 at 5):

> Your grievance has been received, reviewed, evaluated and the following has been determined.

> 33-503.001 sections (1)(a)1, 2 and three states the following:

> The Chaplaincy Service Section of the Office of Education and Initiatives Is responsible for:
> 1. Developing and evaluating religious programs throughout the Department
> 2. Coordinating all religious programs throughout the Department
> 3. Providing general assistance and guidance to chaplain.

In previous conversations with the chaplain you were informed that although the Department recognizes Mysticism there are no guidelines for this religion within the Technical Guide. The authority to develop such guidelines clearly is with The Chaplaincy Service, not the local Chaplain.

Based upon the Florida Admin[.] code as quoted above[,] your grievance is denied.

14. Plaintiff filed a second informal grievance on the same day, October 26, 2011 (Doc. 63 Ex. 1 at 20; Doc. 65 Ex. 3 at 3):

I am grieving the fact that Chapl[a]in Parsons and myself talked over 10 days ago about my faith "Mysticism." At that time and until now, Chapl[a]in Parsons has not attempted to find out what times I must pray and commune with God, nor has he called me in to be able to pray and commune w/ God. He is not making an attempt to help me further my spirituality, as per his job requirement per Chpt. 33-[503].001c, 2(a), 2(b), 2(c), 2(c)(3).

Relief sought: To be allowed to pray and commune with God, with Chapl[a]in Parsons trying to further my spiritual needs, or a chapl[a]in who abides by Chpt. 33-[503].001[,] Replace and[/]or instruct Chapl[a]in Parsons on his duties.

   a. The informal grievance was denied using the exact same explanation as the denial of his other October 26, 2011 grievance. (Doc. 63 Ex. 1 at 20; Doc. 65 Ex. 3 at 3); *see supra* ¶ 13(a).

15. On November 9, 2011, Plaintiff appealed the denials of his October 26, 2011 informal grievances. (Doc. 63 Ex. 1 at 21–22; Doc. 65 Ex. 11 at 9–10).

   a. HCI's warden denied the grievance, explaining that the response to his informal grievance was appropriate and that Defendant Taylor would advise Plaintiff concerning his issues. (Doc. 63 Ex. 1 at 23; Doc. 65 Ex. 11 at 8)

   b. On December 6, 2011, Plaintiff appealed to the Secretary of the Florida Department of Corrections. (Doc. 65 Ex. 11 at 14)

       i.  The Secretary denied the appeal in March 2012, explaining (Doc. 63

Ex. 1 at 25; Doc. 65 Ex. 11 at 13):

> Your administrative appeal has been received, evaluated
> and referred to Chaplaincy Services who provided the
> following information:
>
> According to your request and the chaplain's replies you
> were appropriately told that you could not be called to the
> chapel 8 times a day for prayer nor have a match for each
> prayer. The Chapel schedule is based on time, space and
> supervision availability; no group or individual is permitted
> to use the chapel 8 times every day. If you desire a
> medallion you should notify that chaplain as to the
> medallion you request then the chaplain can determine if
> the medallion is permitted. You must have the religious
> headquarters of your faith group write to the chaplain, using
> their own letterhead paper, the requirements and religious
> paraphernalia necessary for their faith. The institution
> responded appropriately.

16. On September 8, 2013, Plaintiff submitted a request to food service to be given

only fruit juice and no food during an upcoming forty-day religious fast. (Doc. 65 Ex.

16 at 2)

    a.  The response to his request indicated that Defendant Parsons would need

to make the request on Plaintiff's behalf. (Doc. 65 Ex. 16 at 2)

    b.  Plaintiff, accordingly, submitted a request to Defendant Parsons, who denied

the request, explaining that Plaintiff could eat or drink what was offered by

food service, or choose not to do so. Permission from a chaplain was not

required. (Doc. 65 Ex. 16 at 3)

    c.  Plaintiff, ultimately, received assistance from Assistant Warden Morris and

Food Service. (Doc. 65 Ex. 16 at 4)

17. On February 28, 2014, Plaintiff submitted an inmate request to Defendant Parsons regarding the February 26, 2014, confiscation of his tarot cards. He asked that the cards be returned to him, rather than be stored in the chapel. Alternatively, he requested that the cards be stored in the chapel for his use only and that he be placed on the call-out list daily at the same time to use them in the chapel. (Doc. 65 Ex. 12 at 2)

   a. Defendant Parsons denied the request, explaining that: (1) pursuant to Florida Administrative Code Section 33-602.201(13)(d), his tarot cards would remain in the chapel; and (2) he could submit an inmate request to be placed on the call-out list to use them in the chapel, and he would be placed on the call-out list as time and space permitted. (Doc. 65 Ex. 12 at 2)

18. On May 9, 2014, Plaintiff submitted a request to Defendant Parsons for a time slot for a Mysticism study group for five registered mystic inmates at HCI. (Doc. 63 Ex. 1 at 28)

   a. Defendant Parsons responded by explaining that he "need[ed] a request from everyone who wants this class first." (Doc. 63 Ex. 1 at 28)

19. On May 21, 2014, Plaintiff submitted another request to Defendant Parsons, stating that "all the mystics have submitted a class 'study group' request" and that he "again request[s] a Mysticism study group and to be added to the list." (Doc. 63 Ex. 1 at 29)

   a. Defendant Parsons responded, "[w]hen a volunteer is available to supervise this class, I will schedule it." (Doc. 63 Ex. 1 at 29; *see also* Doc. 63 Ex. 1 at 2)

b. On June 13, 2014, Plaintiff filed an informal grievance complaining that Defendant Parsons had not responded to his request for a Mysticism study group. (Doc. 63 Ex. 1 at 26; Doc. 65 Ex. 6 at 3)

   i. Defendant Parsons denied the informal grievance, explaining, "[t]he chaplain does not have the time or space to accommodate another group that does not have an outside volunteer.  No additional groups will be allowed unless they have an outside sponsor.  When Mystics have an outside sponsor (volunteer) then the chapel will give the group further consideration."  (Doc. 63 Ex. 1 at 26; Doc. 65 Ex. 6 at 3; *see also* Doc. 63 Ex. 1 at 2)

20. On September 5, 2014, Plaintiff requested Defendant Parsons place him on a vegan diet for religious reasons.  Defendant Parsons directed him to submit the request to food service. (Doc. 63 Ex. 1 at 30)

21. On March 1, 2015, Plaintiff submitted a request to Defendant Parsons asking to be permitted to possess "a Masonic ring with square and compass[] that [his] late grandfather wore[,] who was both a Mason and Mystic."  He cited three books in support of his claim that the ring "[i]mbues and lends it's spiritual and religious (mystic) protective power to [him]."  (Doc. 66 Ex. 1 at 14)  He further submitted a Religious Property Approval Form for the ring, along with his previously obtained Masonic Religious Material Property Card to demonstrate his purported entitlement to the ring. (Doc. 66 Ex. 1 at 15–16, 18)

   a. Defendant Parsons denied the request, explaining that, "although D.O.C. recognizes mystics, the Department has no guidelines governing local

chaplains['] decisions as to what is authorized.  I suggest you use the grievance process to central office for further assistance." (Doc. 66 Ex. 1 at 14)

22. On March 3, 2015, Plaintiff submitted a request for:

> a stone necklace with amethyst stone medallion, the stones are stones of Thor and Odin, the necklace is constructed to mirror the place of the Gods at the exact moment of my birth; the amethyst medallion is due to the house/Heavenly Hall I was born in and it's [sic] Qabalistic metaphysical protections.

(Doc. 66 Ex. 1 at 6)  He also included a request for a forty-count strand of mala beads for training and "a 150 plus count (chipped) mala strand, as Alfather [sic] is known by over 150 names[,] and I must use them in mantras to evoke him within me." (Doc. 66 Ex. 1 at 6)  The request was accompanied by a Religious Property Approval Form requesting the mala beads. (*Id.* at 7)

   a. Defendant Parsons denied the request on the basis that "[w]e do not have any guideline[s] to show what religion you are." (Doc. 66 Ex. 1 at 6)

   b. On March 20, 2015, Plaintiff filed an informal grievance related to the denial of his request to possess the masonic mystic ring that belonged to his grandfather.  (Doc. 66 Ex. 1 at 8–9)

      i. The informal grievance was denied, with the explanation that " '[r]eligious beliefs do not justify violation of Department of institutional rules and regulations.'  This includes inmate property rules which permit only wedding bands, no other rings are permissible including religious rings.  The institution responded appropriately."

(Doc. 66 Ex. 1 at 10 (quoting Florida Administrative Code Section 33-503.001(2)(c)2))

   c. On April 5, 2015, Plaintiff appealed the denial of his informal grievance. (Doc. 66 Ex. 1 at 11, 12)

      i. The warden denied the appeal, explaining that the response Plaintiff received to his informal grievance appropriately addressed his concerns. (Doc. 66 Ex. 1 at 13)

   d. On March 20, 2015, Plaintiff also filed a separate informal grievance related to the denial of his request for a religious necklace with medallion and two sets of mala beads. (Doc. 66 Ex. 1 at 9)

      i. Defendant Parsons denied the grievance. (Doc. 66 Ex. 1 at 9)[6]

   e. Plaintiff appealed the denial of his informal grievance, and the warden denied the appeal, explaining that the response Plaintiff received to his informal grievance appropriately addressed his concerns. (Doc. 66 Ex. 1 at 3)

23. On March 15, 2015, Plaintiff submitted an inmate request "to be placed on the Catholic Mass call-out for 4-2-15[,] as [he was] invited to attend the sacrament of conf[i]rmation." (Doc. 65 Ex. 5 at 5) The request was granted. (*Id.*)

24. On March 19, 2015, Plaintiff submitted an inmate request "to be placed on the call-out for the Joyce Meyer Service on April 14," which was granted. (Doc. 65 Ex. 5 at 4)

---

[6] The denial stated, "[p]lease see the attached response." (Doc. 66 Ex. 1 at 9) However, no response was attached to the document provided to the Court.

25. On May 26, 2015, the Secretary denied Plaintiff's grievance appeal, stating (Doc.

66 Ex. 1 at 2):

> Your administrative appeal has been received, evaluated and referred to Chaplaincy Services, who provided the following information: You may study your faith through the use of the chapel library when it is open and you have free time. You may also take correspondence courses and purchase literature of your own to study, keeping in mind that all literature must adhere to the Admissible Reading Rule. Further, you must have the religious headquarters of your Mystic faith group send to the chaplain on their letterhead the list of their holy days, scriptures or holy books and any required religious paraphernalia. Once this is accomplished the institution and the Department . . . can proceed with any necessary changes. Thus the institution responded appropriately.

26. The "Religious Appendix"[7] provided by Plaintiff (Doc. 65 Ex. 15) contains a

"Mysticism's Technical Guide" that includes the following information and citations

about the religious items and practices that Plaintiff requested:[8]

   a. "Mystic Oils: 1.) Anointing oil, 2.) Ancient Wisdom or High John's Source: Franz Bardon Bk 2 pg.68 'For particular operations he is also required sacrificial blood, also known as Holy oil, with which the Magician embrocates his instruments and anoints specific areas of his body.' "

   (Doc. 65 Ex. 15 at 31)

   b. "Candles: (7) Sacred colored tapered candles. Source: The Key of Solomon the King, p.108 'It hath been ever the custom among all natio1s to use fire and light in sacred things. For this reason the Master of the Art should employ them in sacred rites, and besides those for reading the conjurations by, and for the incense, in all

---

[7] The appendix appears to have been authored by Plaintiff himself. (*See e.g.*, Doc. 1 at 7 (relief requested includes permission to submit guidelines on Mysticism for the chaplain to use); Doc. 65 Ex. 15 at 12 (notation indicating sources from which the "Essential Tenets of Faith and Belief" were compiled); Doc. 65 Ex. 15 at 31 ("Plaintiff now provides a listing of requested items and their authoritative sources."); Doc. 65 Ex. 15 at 39 (notation that "Plaintiff has simplified the prayer times" from his original request))

[8] The provided Mysticism Technical Guide includes a lengthy list of items requested by Plaintiff. (Doc. 65 Ex. 15 at 31–39) However, some of those items do not appear in the inmate request forms submitted by Plaintiff to Defendants. Accordingly, the Court confines its analysis to those items that the record demonstrates Defendants considered and rejected.

operations lights are necessary in the Circle.' Agrippa's Occult Philosophy Bk1. Pp. 148, 149 'And we shall afterwards speak of some colors which are the planets, by which the natures of Fixed Starts themselves are understood, which also may be applied to the flames of lamps and candles.' "

(Doc. 65 Ex. 15 at 31–32)

c.  "Incense: (7) Sacred planetary incense, (12) Holy/Heavenly Zodiacal Hall Incense.  Source: The Key of Solomon the King. Chpt. 12 p. 108, Chpt. 10 p. 105. 'for a suitable suffumigation, thou may burn temple incense, as it gives . . . a most fragrant odor which seems to posses[s] the power to attract the GOOD SPIRITS and forces the EVIL ones to go away f[ro]m thee.[']

Agrippa's occult philosophy BK 1 chpt. XLIV p.135-137 list the Suffumigations (incense) to use.

The Poetic Edda, Lee M. Hollander Hyndluluod, Stanzas 9-10 'Burnt offerings on the Altar',

Skirnismal, Stanzas 8-9, 17-18 Fire and smoke must be u ed to get Prayers to the hall (heaven)."

(Doc. 65 Ex. 15 at 32)

d.  Herbs:

"And in the Hall of Hair (Sacred Holy Space 'circle' to Alfather Odin) burned her three times burned they (three stages of Holy herbs to provide materialization) the thrice reborn, even and anon: even now she liveth.

First Herb: White Oak bark, cut source: Gudrunarhvqt Stanza 22, Peetic Edda Bruning of oak.

Second Herb: Mini Verba Lena Yesca, Source: Agrippa's occult philosophy BK1 Chpt. XLIII pp. 132-134 'Some suffumigations, also, or perfuming, that are proper to the stars, are of great force for the opportune receiving of celestial gifts under the rays of the star, in as much as they do strongly work upon the air and breast.

Which Suffumigations, indeed, being duly appropriated of any certain deities, do fit us to receive divine inspiration.'

The rest of the Chapter list[s] herbs that combined become Mini Yerba Lena Yesca.

Third Herb: Abra Melin source: The Book of the sacred Magic of Abramelin the Mage. P.77 'The perfume shall be made thus: Take of Incense in tears* Olibanum one part; of Stacte or Storax half a part; of Lign Alves a Quarter of a part; and not being able to get this wood

you shall take that of cedar, or of rose, or of Citron, or any other odoriferous wood.'

All three herbs and the combinations to make them ban be found in Agrippas's Occult Philosophy BK 1 pp. 133-137.

It shall be noted that neither of the Holy and divine herbs are illegal substances."

(Doc. 65 Ex. 15 at 33–34)

e. "Runes: (25) Metaphysical rune stones Source: Futhark, Edred Thorsson pp. 5, 6, 11. 'Runes have been found carved on wood, stone, metal, and bone objects.' 'the greater number of runic inscriptions are on rune stones, of which approximately twenty-five (25) Hundred are known' 'There are also a few stone talismans.'

Raven Kaldera and Galina Krasskova: Neolithic Shamanism: spirit work in the Norse tradition. See Appendix (I) Copy of Meta physical rune stones etched with runes and copy of book covers.

Additional Reference Source Material.

Eliphas Levi (Translated by A.E. Waite) History of Magic Quoting Hermetic Philosopher Oswald Crollins from the book of Signatures. 'The characters of different writings were borrowed primitively from these natural signatures existing in stars and flowers, on mountains and the smallest pebble. The figures of crystals, the marks on minerals were impressions of the thought which the creator had in their formation.'

The above quote is provided for the Runes, Metaphysical necklace and Medallion, and pray[er] beads/Meditation beads."

(Doc. 65 Ex. 15 at 35–36)

f. "Holy Mystical Stone Necklace and Medallion (Metaphysical stones): Medallion (Silver double headed fire phoenix on top of volknot, Mounted on Amethyst Stone (2" by 2" teardrop shape) Volknot is the symbol for the Einherjar (Odin's hand Chosen)

Source: Franz Bardon BK 2 pp 68-69 Additional Magical aids, Necklace, and BK 2 pp68-69 Additional Magical Aids, Necklace, and B~ 2 p 297 'The purpose of a Talisman, amulet or any birthstone is to raise, Strengthen and maintain a level of belief and confidence of the person who is wearing it. Owning to the fact that the wearer pays considerable attention to his talisman, the subconscious is auto-suggestively influenced towards the desired direction, and various effects can be achieved in accordance with the person's inclination. Finally, I would like to mention the precious and semi-precious stones which are especially suitable fluid condensers and which have been used from ancient times as good luck charms, to provide protection,

to attain success and to effect cures. Astrology has assigned to every Gemstone a particular effect and recommended the wearing of the appropriate birthstone.'

Light of Egypt Vol. 1 p 214, Thomas H. Burgoyne list the Amethyst to be plaintiff's birth stone to be used in Medallion."

(Doc. 65 Ex. 15 at 36–37)

g.  Prayer and Meditation beads (Metaphysical chipped stones) 120 plus small beads.      Source: Poetic Edda, The Alfather Odin is known by over 200 hundred names of those 150 are recorded, during adorations to each name to receive the blessings of these names the prayer strand serves as a counter so as not to disturb the mind while focusing on mantra of the name.

Franz Bardon BK. 1 p 84 Instructs for the use of a set of (40) beads while performing the Mystical exercises the provides [sic] to make the Mystic Stronger spiritually.

(Doc. 65 Ex. 15 at 37)

h.  "Mystical Tarot Deck. Source: Franz Bardon BK 1 and Bk 2[.]    BK 1 p. 18  'Many readers are probably aware that the Tarot is not a game of cards serving mantic or prophetic purposes. . . . Instead it is a book of initiation in which the greatest secrets are contained symbolically.' BK 2. P. 11.  [']In accordance with the ancient Egyptian Mysteries, the Magic of the Second Tarot is represented by the High Priestess.  I shall gladly continue to guide the Serious, diligent reader and student of magic along the proper path.' "

(Doc. 65 Ex. 15 at 38)

i.  "Charcoal: Charcoal is placed lit within the censer where the three (3) holy herbs are places to fumigate."

(Doc. 65 Ex. 15 at 38)

j.  "Small Box: The box serves as the covenant of a[n] Arch.  Source: Franz Bardon BK 2. P 69  'Every magical aid must be safely stored immediately after use.' "

(Doc. 65 Ex. 15 at 38)

k.  "Lighter, (1) one to light her[b]s, incense, candles, and charcoal."

(Doc. 65 Ex. 15 at 39)

l. "Prayer Time Hours Source: The Keys of Solomon the Kin p. 6 for Monday — Sunday 6 AM, 1 PM, 8 PM! The fourth prayer is at 4 PM every day. Plaintiff has simplified the prayer times of the four that changed, which will no longer cha[n]ge times. The other (4) are sunrise (at that time), Noon (at that time), sunset (at that time), Midnight (at that time) the exact times are to be observed, not afterwards."

(Doc. 65 Ex. 15 at 39)

27. Section 33-602.201(16)(c)(1)(i) of the Florida Administrative Code permits inmates adhering to the tenets of a particular religion to possess:

[o]ne religious symbol or medallion, such as a cross, Star of David, or talisman, or other religious medallion. Religious symbols shall not be more than 2 inches in length or diameter, and symbols worn about the neck shall be worn under the shirt on a jewelry-type chain. Religious symbols that are designed to be affixed to clothing with a pin are not permitted.

(*See also* Affidavit of Alexander Taylor, Doc. 62 Ex. 1 at 5–6 ("All inmates are permitted a religious medallion in keeping with their religion. The restrictions on a medallion have to do with cost limits, size and any risks connected with the item itself. These risks include any medallion that is obviously offensive to the extent it may cause a disturbance, or a medallion that has secret compartments where contraband may be secreted.")).

28. Section 33-602.201(16)(c)(1)(h), Fla. Admin. Code, permits inmates adhering to the tenets of a particular religion to possess "[o]ne set of prayer beads, such as Rosary, Dhikr, Orisha, Mala, or Japa-Mala beads."

29. Section 33-602.201(16)(c)(2)(c), Fla. Admin. Code, permits inmates adhering to the tenets of Asatru or Odinism to possess runes and an accompanying cloth bag.

30. Section 33-602.201(16)(d)(1), Fla. Admin. Code, requires that tarot cards be stored in the chapel and be used "only under the supervision of the chaplain or an approved volunteer."

31. Each of Plaintiff's previously described Mysticism-related requests was submitted on a DC6-236 Inmate Request Form.

32. Inmate Douglas Jackson, who was housed with Plaintiff, "observed [Plaintiff's] constant and consistent prayers all throughout the day and night." (Doc. 66 Ex. 2 at 4)  Plaintiff informed Douglas Jackson that Plaintiff must continue his prayers, even though his attempts were in vain without the necessary religious items. (Doc. 66 Ex. 2 at 4–5)

## IV.  ANALYSIS

Each side has filed a motion for summary judgment in this case.  "[C]ross-motions may be probative of the non-existence of a factual dispute," but "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir.1975)).

Upon review, Plaintiff's motion for summary judgment and response in opposition to Defendants' motion for summary judgment focus heavily on demonstrating proof of factual disputes, allegedly material, in the record.  Plaintiff has, therefore, not demonstrated that he is entitled to judgment as a matter of law, *see* Fed. R. Civ. P. 56, and Plaintiff's motion for summary judgment is **DENIED**.  Accordingly,

the remainder of this Order will consider Defendants' motion for summary judgment, viewing the evidence in the light most favorable to Plaintiff, the non-moving party.

## 1. RLUIPA

Section 3 of RLUIPA "protects institutionalized persons who are unable to freely attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). Section 3 provides that:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . unless the government demonstrates that imposition of the burden on that person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Prison inmates are, therefore, afforded "a heightened protection from government-imposed burdens, by requiring that the government demonstrate that the substantial burden on the prisoner's religious exercise is justified by a compelling, rather than merely a legitimate, governmental interest." *Smith v. Allen*, 502 F.3d 1255, 1266 (11th Cir. 2007) (citation and internal quotation marks omitted), *abrogated on other grounds by Sossaman v. Texas*, 563 U.S. 277 (2011). In so doing, "section 3 affords confined persons greater protection of religious exercise than what the Constitution itself affords." *Id.* (citation and internal quotation marks omitted).

In order to succeed on his RLUIPA claims, Plaintiff must first demonstrate that his observance of Mysticism constituted a "religious exercise" under the statute. *Allen*, 502 F.3d 1276. Under RLUIPA, the term "religious exercise" is broadly defined to

mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(a).  *See also Allen*, 502 F.3d 1276–77.  Given this broad definition, and the fact that Mysticism is a religion recognized by the Department of Corrections, Plaintiff's practice of Mysticism constitutes a religious exercise for the purpose of RLUIPA.

Second, Plaintiff must demonstrate that his religious exercise was substantially burdened.  *Allen*, 502 .3d at 1277.  "Substantial burden" means "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."  *Id.* (quoting *Midrash v. Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)).  Further, "the government's action must be 'more than . . . incidental' and 'must place more than an inconvenience on religious exercise.' "  *Id.* (quoting *Midrash*, 366 F.3d at 1227).  Instead, it "must significantly hamper one's religious practice."  *Id.*

Plaintiff alleges that Defendant Parsons substantially burdened the practice of his religion by denying every request he has submitted for religious items related to Mysticism, for access to the chapel, and to schedule a Mysticism study group.  He also claims that Defendant Taylor failed to respond to the letters Plaintiff wrote him regarding his religious requests.

Defendants, in turn, argue that Plaintiff has not demonstrated that his religious exercise was substantially burdened because he has not shown that the items and practices requested are fundamental to Mysticism.  They generally claim that the items sought are contraband and that Plaintiff has failed to provide them with authoritative information on Mysticism to frame the contours of his religious practice.  Defendants

also argue that, even if Plaintiff had demonstrated their actions constituted a substantial burden on his practice of Mysticism, their actions are in furtherance of the compelling governmental interests of safety, security, and institutional operational needs. They identify concerns such as fire, the possibility that a medallion may pose a hazard as a weapon, and the need to have knowledge of inmates' whereabouts at all times.

Plaintiff presents evidence that Defendants: (1) did not allow him to obtain or possess mystic oil, incense, charcoal disks, tapered candles, matches or a lighter, a religious medallion, crystal or stone runes, a stone necklace and medallion, a forty-count strand and a 150-count strand of mala beads, a box to store the various religious items, a small plastic bottle to store the mystic oil, and his grandfather's masonic ring (Doc. 63 Ex. 1 at 16, 18–19; Doc. 65 Ex. 11 at 4–6; Do. 66 Ex. 1 at 3, 6, 8–18); (2) denied his requested assistance to observe a religious fast (Doc. 65 Ex. 16 at 2–4); (3) denied his request to schedule a Mysticism study group (Doc. 63 Ex. 1 at 26, 28–29; Do. 65 Ex. 6 at 3); and (4) denied his request to be placed on the call-out to go to the chapel daily for prayer and to use his tarot cards (Doc. 63 Ex. 1 at 13, 20; Doc. 65 Ex. 3 at 2–3; Doc. 65 Ex. 12 at 2). However, for the reasons that follow, Plaintiff has failed to demonstrate a *prima facie* claim under RLUIPA, because he has not shown that Defendants' denial of the requested items or practices was fundamental to his practice of Mysticism.

"While it is true that courts are not to inquire into the centrality of a particular religious tenet in undertaking the substantial burden analysis, at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the

government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice." *Allen*, 502 F.3d at 1278. Therefore, in order to succeed under RLUIPA, Plaintiff is required to provide authority in support of his assertions that the requested religious items and practices are fundamental to his practice of Mysticism — his mere belief that they are fundamental is insufficient. *See Allen*, 502 F.3d at 1278 ("If the word 'substantial' in the statutory phrase 'substantial burden,' 42 U.S.C. § 2000cc-1(a), is to retain any meaning, it must, at a minimum, be construed as requiring something more than solely the denial of a request that is sincere."). *See also Smith v. Governor for Ala.*, 562 F. App'x 806, 813 (11th Cir. 2014) (citing *Allen*, 366 F.3d at 1278–79) ("While [the plaintiff] presented to the court statements in his own affidavit that he needed these items for worship, those personal assertions — without any support from authoritative sources — cannot meet the standard for proving a substantial burden.").

To the extent Plaintiff contends that no request was made of him to provide further information or authoritative support, that argument is belied by the evidence. Although Defendant Parsons' responses to his requests did not specifically ask for the information, the record demonstrates that, as early as December 6, 2011, the Secretary of the Department of Corrections instructed Plaintiff that he "must have the religious headquarters of [his] faith group write to the chaplain, using their own letterhead paper, the requirements and religious paraphernalia necessary for their faith." (Doc. 63 Ex. 1 at 25; Doc. 65 Ex. 11 at 13)

Additionally, review of the evidence reveals that Plaintiff provided little to no authoritative support to Defendants for his religious requests. In his request to possess

his grandfather's masonic ring, Plaintiff cited the titles of three resources and asserted that the ring "[i]mbues and lends it's [sic] spiritual and religious (mystic) protective power to [him]." (Doc. 66 Ex. 1 at 14)  Similarly, in his request for mala bead strands, he explained that he would use the the forty-count strand for "training," and he would use the 150-count strand in mantras to evoke the Alfather within him.  (Doc. 66 Ex. 1 at 6)  However, nothing in those statements demonstrates that the ring or mala bead strands are fundamental to the practice of his Mystic faith.  Further, he provided no authoritative support for the other sought-after items and practices.

Plaintiff now submits a "Religious Appendix" containing a "Code of Conduct and Pledge to Mysticism," a "Vow and Oath to the One Supreme Creator," "Essential Tenets of Faith and Belief," and "Mysticism's Technical Guide." (Doc. 65 Ex. 15 at 2–39)  As described in the list of undisputed facts herein, the Mysticism Technical Guide created by Plaintiff contains information about the requested items and practices sought by Plaintiff in this litigation.  The information quoted by Plaintiff from other sources generally describes the items requested or their intended uses.

However, Plaintiff failed to provide this appendix of information to Defendants at any time before this lawsuit.  Additionally, the appendix does not comply with the March 2012 or May 2015 grievance denials requiring the religious headquarters of his faith group to write to the chaplain on its own letterhead to describe the requirements and paraphernalia necessary for Mysticism.  (Doc. 63 Ex. 1 at 25; Doc. 65 Ex. 11 at 13; Doc. 66 Ex. 1 at 2)

Moreover, Plaintiff's guide does not indicate the relevance of the item or practice to Mysticism.  Only two of the relevant citations specifically refer at all to

Mysticism — "[p]rayer and meditation beads" and "[m]ystical [t]arot [d]eck." (Doc. 65 Ex. 15 at 37, 38)  The entry on prayer beads explains that the requested strand of "120 plus small beads" is used to count during adoration of the 150 known names of the Alfather Odin, while the requested strand of forty beads is used during unspecified mystical exercises to enhance the practitioner's spiritual strength.  (Doc. 65 Ex. 15 at 37)  Regarding the deck of tarot cards, the reference to Mysticism is limited to the entry's title — "Mystical Tarot Deck." (Doc. 65 Ex. 15 at 38)  Otherwise, the quoted source information merely describes the tarot as "a book of initiation in which the greatest secrets are contained symbolically," and does not refer to any particular faith or religion.  (Doc. 65 Ex. 15 at 38) [9]

Overall, the entries and other evidence fail to provide sufficient information and context for a jury to reasonably find that the requested items and practices are fundamental to Plaintiff's exercise of Mysticism.  *See e.g.*, *Allen*, 502 F.3d at 1278 (finding the prisoner plaintiff did not demonstrate the fundamental nature of a quartz crystal to his practice of Odinism, where the plaintiff provided authority to support his position, but sources noted by the plaintiff only generally discussed the use of such crystals by shamans and in societies across the world, did not mention Odinism, and did not indicate such a crystal was necessary to the practice of Odinism).  The Court, accordingly, concludes that Plaintiff has demonstrated nothing more than an incidental burden on his practice of Mysticism. *See Allen*, 502 F.3d at 1279.

---

[9] Moreover, the evidence demonstrates that Plaintiff was, indeed, able to observe the fast for which he claims Defendant Parsons failed to assist him. (Doc. 65 Ex. 16 at 4)

The Court notes that issues of fact exist regarding the sincerity of Plaintiff's professed religious beliefs and whether he properly requested access to the chapel to use his tarot cards and for prayer. For example, Defendants point to Plaintiff's failure to request to attend chapel and failure to submit authoritative information about the Mystic faith as evidence that his professed Mystical beliefs are not sincere. However, Plaintiff has provided evidence of the sincerity of his beliefs in the form of an affidavit from inmate Douglas Jackson, who avers that he observed Plaintiff praying consistently throughout the day and night, even though Plaintiff believed the prayers to be in vain without access to the items that he sought. (Doc. 66 Ex. 2 at 4) The evidence further shows that Plaintiff has tarot cards that are stored in the Chapel. See Fla. Admin. Code § 33–602.201(16)(d)(1) (listing tarot cards as a religious item permitted to be stored and used in the chapel — but not in an inmate's cell or sleeping area — due to general security risks). Plaintiff complains he has not been granted access to the chapel to use his tarot cards. Defendants contend that Plaintiff has not properly requested to be placed on call-out to use the cards in the chapel. The record of Plaintiff's submitted inmate requests indicates that he did request to use the cards daily in the chapel as an alternative to his request to keep the cards in his possession. (Doc. 65 Ex. 12 at 2) However, the response to that request instructs him that he needs to request to be placed on the call out list to attend the chapel for such use. (Doc. 65 Ex. 12 at 2) Similarly, Plaintiff generally requested access to the chapel for prayer up to eight times per day. Yet, Defendants contend he did not properly request to be placed on the call-out for chapel. Notably, more specific requests submitted by Plaintiff — to attend other religious services with identified dates and times — were

granted.  (Doc. 65 Ex. 5 at 4–5) Therefore, a question of fact exists regarding whether Plaintiff's attempts to request chapel attendance were sufficient for that purpose.

Nevertheless, given Plaintiff's failure to demonstrate that the requested items and practices are fundamental to his practice of Mysticism, those questions of fact are not material.  *See Celotex*, 477 U.S. at 322–23.

Because Plaintiff has not shown that Defendants have imposed more than a mere inconvenience on his religious exercise, the Court does not address whether Defendants' denials of those religious items and practices were the least restrictive means of furthering a compelling governmental interest.  Summary judgment is, therefore, **GRANTED** to Defendants on Plaintiff's RLUIPA claims.

## 2. FRFRA

Plaintiff also attempts to assert a claim under the FRFRA, which provides, Fla. Stat. § 761.03(1):

> (1) The government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, except that government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person:
>
> (a) Is in furtherance of a compelling governmental interest; and
>
> (b) Is the least restrictive means of furthering that compelling governmental interest.

Federal and state courts apply the same analysis under FRFRA as under RLUIPA. *Westgate Tabernacle, Inc. v. Palm Beach Cty.*, 14 So. 3d 1027, 1031 (Fla. 4th DCA 2009).

Additionally, the definition of "substantial burden" is the same under FRFRA as under RLUIPA. *Compare Warner v. City of Boca Raton*, 887 So. 2d 1023, 1035 (Fla. 2004), with *Allen*, 502 U.S. at 1277; *Midrash*, 366 F.3d at 1227.

Accordingly, because Plaintiff has not demonstrated that Defendants created a substantial burden on his religious rights under RLUIPA, he has not shown that Defendants created a substantial burden on his religious rights under FRFRA. Summary judgment is, therefore, **GRANTED** to Defendants on Plaintiff's FRFRA claims.

### 3. Section 1983

To succeed on his Section 1983 claims, Plaintiff must demonstrate "the violation of a right secured by the Constitution and laws of the United States" by "a person acting under color of state law." *Cummings v. DeKalb Cty.*, 24 F.3d 1349, 1355 (11th Cir. 1994). Plaintiff asserts claims pursuant to Section 1983 for violation of the free exercise and equal protection rights afforded him by the United States Constitution.

#### a. Free Exercise of Religion

Under the First Amendment, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). However, as previously explained, RLUIPA affords prisoners greater protection of religious exercise than that afforded by the Constitution. *Allen*, 502 F.3d at 1266 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005)) ("RLUIPA . . . affords to prison inmates a 'heightened protection from government-imposed burdens,' by requiring that the government demonstrate that the substantial burden on the

prisoner's religious exercise is justified by a compelling, rather than merely a legitimate, governmental interest."). Because Plaintiff's evidence is insufficient to demonstrate a substantial burden on his religious practice under RLUIPA, it is insufficient to support his Section 1983 free exercise claim. Defendants' motion for summary judgment is, therefore, **GRANTED** as to Plaintiff's Section 1983 free exercise claims.

### b. Equal Protection

"To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318–19 (11th Cir. 2006) (citing *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir.2001)). *See also McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (explaining that a plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose").

Plaintiff claims that Defendants violated his equal protection rights when Defendants denied his efforts to practice his Mystic religion and his requests for allegedly related religious items, while permitting prisoners who affiliate themselves with more mainstream religions to practice similarly and obtain the same items. (Doc. 1 at 5, 8) He states that every religion has a mystical path. He argues that allowing a prisoner who practices a mainstream religion to engage in a particular religious practice or obtain certain religious items, while denying the same to him — a "Mystic who pulls from these religions" — violates his equal protection rights. (Doc. 1 at 8)

Specifically, Plaintiff argues that: (1) the Florida Administrative Code permits the use of runes, tarot cards, prayer beads, and religious medallions; (2) DOC Procedures permit the use of lighters or matches for approved religious ceremonies and permit Native Americans to use three holy herbs; (3) the religious technical guides for the Muslim, Catholic, Jewish, Odinist, Wiccan, Buddhist, and Native American faiths allow the use of "incense, candles, lighters or matches, robes, ritual horns or chalices, ritual prayer and oil, and wands;" and (4) Muslim prisoners are permitted to access the chapel five times per day during Ramadan, and the chaplain puts those prisoners on the call-out list for every prayer. (Doc. 64 at 10–11)  Plaintiff further alleges that Defendant Parsons told him he would reject all requests by Plaintiff based on his Mystic faith. (Doc. 1 at 9).

Defendants contend that they have not treated Plaintiff differently from any other similarly situated group and note further that "these other persons or groups have responded in some form or fashion to demonstrate with authority what and how they wish to practice."  (Doc. 73 at 7)  Specifically, Defendants claim Plaintiff has not used the proper procedures set in place to request the items sought or to request to be called out for access to the chapel.  (Doc. 63 at 20)  Overall, Defendants argue that Plaintiff cannot demonstrate a discriminatory purpose for the denials of his requests.  (Doc. 63 at 21)

Upon review of the record before the Court, Plaintiff has failed to show that he is similarly situated to prisoners who have requested and obtained the same items and practices sought without success by Plaintiff.  Although he cites Section 33-602.201(16)(c) of the Florida Administrative Code, that provision does not support

his assertion that the law necessarily permits **all** prisoners to use runes, tarot cards, prayer beads, and religious medallions.

Section 33-602.201 states, "[u]nless otherwise prohibited by department rule or by paragraph (e) of this subsection, inmates shall be permitted to possess the following items *adhering to the tenets of a particular religion.*" Fla. Admin. Code § 33-602.201(16)(c) (emphasis added). The list permits a prisoner who is adhering to the tenets of a particular religion to possess "[o]ne set of prayer beads, such as Rosary, Dhikr, Orisha, Mala, or Japa-Mala beads." Fla. Admin. Code § 33-602.201(16)(c)(1)(h). Section 33-602.201(16)(c)(1)(i) permits such a prisoner to possess:

> [o]ne symbol or medallion, such as a cross, Star of David, or talisman, or other religious medallion. Religious symbols shall not be more than 2 inches in length or diameter, and symbols worn about the neck shall be worn under the shirt on a jewelry-type chain. Religious symbols that are designed to be affixed to clothing with a pin are not permitted.

As determined with respect to Plaintiffs' RLUIPA, FRFRA, and free exercise claims, Plaintiff has not established that the items requested are fundamental to the tenets of Mysticism.

Moreover, regarding his mala beads request, Plaintiff originally requested two different sets of beads, not one. He has presented no evidence showing that he ever submitted a request for just one set of mala beads. Similarly, he has not demonstrated that he submitted a request for a medallion that complies with Section 33-602.201(16)(c)(1)(i). The record contains two requests for a medallion. The first request, on October 25, 2011, merely stated that he required "a medallion that reflects [his] religious beliefs." (Doc. 63 Ex. 1 at 16; Doc. 65 Ex. 11 at 4) This request did not describe the medallion in any detail or particularity or the means by which the medallion

would be worn. The second request, on March 3, 2015, described the medallion as follows:

> a stone necklace with amethyst stone medallion, the stones are stones of Thor and Odin, the necklace is constructed to mirror the place of the Gods at the exact moment of my birth; the amethyst medallion is due to the house/Heavenly Hall I was born in and it's [sic] Qabalistic metaphysical protections.

(Doc. 66 Ex. 1 at 6)[10] While that request contained more detail, including that it would be worn as a necklace, the request still failed to describe the size of the medallion. Again, he has also failed to show the source of the religious tenet that purportedly demands the use of precious stones in a medallion of any size.

Section 33-602.201(16)(c)(2) provides that prisoners who practice Asatru or Odinism are permitted to possess "runes and [an] accompanying cloth bag." While it is undisputed that Plaintiff previously practiced Odinism while at HCI, he changed his religion to Mysticism; therefore, the provision related to Odinism no longer applies to him. As explained, he has not demonstrated that use of the runes is fundamental to Mysticism. *See* Florida Administrative Code Section 33-602.201(16)(c) (requiring that, '[w]hen an inmate makes a change in religious preference, the inmate must dispose of all of the items associated with the previous religion unless such items are also associated with the new religious preference.").

Next, Plaintiff claims that DOC Procedures permit the use of lighters or matches for approved religious ceremonies and permit Native Americans to use three holy

---

[10] Plaintiff argues that he did not know he was supposed to submit a form different than the standard inmate request form, form DC6-236. (Doc. 66 at 16–17) His argument is not persuasive. The Court notes that Plaintiff stated in this request that he had previously submitted a religious property approval form for the necklace and medallion, which was denied. (Doc. 66 Ex. 1 at 6) (The form for the necklace and medallion was not included in the evidence submitted for consideration on summary judgment. He did, however, attach a religious property approval form for the mala beads. (Doc. 66 Ex. 1 at 7)).

herbs. He further claims the DOC religious technical guides for various identified faiths allow the use of incense, candles, lighters or matches, and ritual prayer and oil. However, that evidence is not before the Court for consideration as Plaintiff failed to include in his submissions copies of the DOC procedures and technical guides.

Additionally, Plaintiff alleges that Muslim prisoners at HCI are permitted to access the chapel five times per day during Ramadan and that the chaplain puts those prisoners on the call-out list for every prayer. However, Plaintiff has submitted no evidence to support that assertion. Even had Plaintiff supported his claim with relevant evidence, he has not demonstrated that he is similarly situated to a Muslim inmate seeking prayer during Ramadan, as Ramadan is observed over the course of a defined time period.[11] Plaintiff requested four to eight daily visits to the chapel for prayer for an unspecified and potentially indefinite period of time. As explained, Plaintiff has not demonstrated that his request to pray in the chapel four to eight times per day is fundamental to his observance of Mysticism.

Plaintiff also claims that Defendant Parsons accommodates other religious groups with study group requests who have no approved volunteer for supervision. (Doc. 64 at 9; Doc. 66 at 16) In support, Plaintiff points to Defendant Parsons' response to Plaintiff's June 13, 2014 informal grievance stating, "[t]he chaplain does not have the time or space to accommodate *another* group that does not have an outside volunteer." (Doc. 63 Ex. 1 at 26; Doc. 65 Ex. 6 at 3 (emphasis added)) However, it is undisputed that the chaplain is merely one person, who must divide his time among

---

[11] *See O'Lone*, 482 U.S. at 352 (describing the Muslim observance of Ramadan as a "month-long . . . period of fasting and prayer").

the needs of many inmates. Defendant Parsons' response indicates that his time was full at the time Plaintiff submitted his request for a study group. Therefore, any additional study sessions would need to be supervised by an approved volunteer. (Doc. 63 Ex. 1 at 26; Doc. 65 Ex. 6 at 3) Plaintiff has not offered evidence, only conclusory statements, that subsequent inmates (who requested study groups after Plaintiff's group was denied) were able to obtain a study group session either unsupervised, or supervised by Defendant Parsons, or supervised by a volunteer.

Finally, to the extent Plaintiff generally argues a violation of his right to equal protection because he, as a Mystic, has not been allowed to obtain and use items that are permitted for use by more mainstream religions, that argument is not persuasive. The fact that the Florida Administrative Code permits adherents of some religions to obtain certain items and engage in certain practices or activities while denying the same to others implies a recognition that those permitted items and practices are fundamental to those religions. Plaintiff has not presented any evidence demonstrating that other inmates were permitted to obtain the requested items without showing that they practice religions for which the DOC has no guidance or information and without submitting any authority regarding their religion to support their religious property requests.

Accordingly, because Plaintiff has not satisfied his burden of demonstrating that he is similarly situated to other prisoners who received more favorable treatment,[12]

---

[12] Contrary to Defendants' assertions, Plaintiff has provided evidence of discriminatory intent in the form of an affidavit from a fellow prisoner, Charles Jackson. Inmate Jackson averred that, while assigned as a chapel orderly, he overheard conversations between Plaintiff and Defendant Parsons. He recalls that, among other things, Defendant Parsons mocked and denigrated Plaintiff and other non-Christian inmates. Further, Defendant Parsons "was adamant that he did not care what religion [Plaintiff] professed, [Plaintiff] would not be allowed to practice a heathenistic pagan craft in the chapel." (Doc. 65

Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's Section 1983 Equal Protection claims.[13]

## V. CONCLUSION

Upon consideration, Defendants' motion for summary judgment (Doc. 63) is **GRANTED**.  Plaintiff's cross-motion for summary judgment (Doc. 64) is **DENIED**.  The **CLERK** is directed to enter judgment in favor of Defendants Parsons and Taylor and close this case.

**DONE AND ORDERED** in Tampa, Florida, this 29th day of July, 2019.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

---

Ex. 14 at 2–6)  Defendant Parsons acknowledges that Jackson was assigned as an orderly during the relevant time, but denies Jackson's allegations. (Doc. 63 Ex. 2 at 4–5)  While this conflicting evidence presents an issue of fact on the element of invidious discrimination, the evidence is not material, given Plaintiff's failure to demonstrate that he is similarly situated to other prisoners who received more favorable treatment.  *See Celotex*, 477 U.S. at 322–23.

[13] Because Defendants are entitled to summary judgment, the Court does not consider Defendants' Eleventh Amendment Immunity and Qualified Immunity arguments.